IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:17cr188 |
| | ) | |
| SHAHEEN ("SHANE") SARIRI, | ) | Honorable Leonie M. Brinkema |
| | ) | |
| Defendant. | ) | Sentencing Date: March 9, 2018 |
| | ) | |

**<u>UNITED STATES' POSITION ON SENTENCING</u>**

The United States of America, through undersigned counsel and in accord with 18 U.S.C. § 3553(a) and the U.S. Sentencing Commission Guidelines Manual ("U.S.S.G." or "Guidelines"), hereby provides its position with respect to sentencing for defendant Shaheen Sariri. The United States requests that this Court adopt the findings of the Pre-Sentence Investigation Report ("PSR"), which indicates that the appropriate Guidelines range with respect to incarceration is 57 to 71 months. Based on that advisory Guidelines range and the § 3553(a) factors, and mindful of the sentences that have already been imposed on other co-defendants in this case, the United States recommends a downward variance of 18 months in prison for defendant Sariri.

An 18-month sentence would appropriately capture the seriousness of the defendant's criminal offenses, in which he involved his family members and close friends in a years-long public corruption scheme to bribe several public officials at the Virginia Department of Transportation. And although that sentence would admittedly be higher than that imposed on any other contractor defendant in this case, it would appropriately recognize Sariri's more significant criminal conduct, including his extensive money laundering activity, his repeated false statements and certifications to the government, and his separate offenses relating to possession of controlled

1

substances and firearms.  Moreover, a greater criminal sanction is warranted for defendant Sariri in light of his relative lack of timely acceptance of responsibility when compared to every other defendant in this case.  A meaningful term of incarceration is therefore necessary to specifically deter Sariri from future criminal behavior, promote respect for the law, and provide general deterrence of bribery schemes like this one, which are often quite difficult to detect but carry significant costs for other law-abiding government contractors and for the public's respect and trust in their government and its officials.

Accordingly, the United States requests that this Court impose a sentence of imprisonment of 18 months, to be followed by a period of supervised release of three years.  The United States further requests that the Court enter a forfeiture order in the amount of $699,630.50, representing the proceeds that Sariri derived from his participation in this extensive honest services fraud scheme.

## I.    Factual Background

The defendant, Shaheen "Shane" Sariri, is a college-educated businessman who has owned and operated multiple real estate and trucking businesses.  He formed his own eponymous company, Shane Enterprise, in July 2011.  That company soon began contracting with the Virginia Department of Transportation ("VDOT") to provide snow removal services, including snow plowing and road treatment operations (*e.g.*, salting and sanding) before, during, and after winter snowstorms in the Northern Virginia area.  In early 2014, however, Sariri and Shane Enterprise were debarred from any further contracting relationships with VDOT after the Commonwealth determined that some of Sariri's trucks did not meet Virginia's state vehicle inspection requirements and were being operated by drivers who did not have a valid commercial driver's license.  *See* Exhibit 1 (April 22, 2014 and June 10, 2014 VDOT debarment letters to Sariri).  At

least one of Shane Enterprise's contracts with VDOT was accordingly terminated "for default" under the Virginia Public Procurement Act.  *Id.* at 2.

Thereafter, Sariri submitted four other proposed snow removal agreements to VDOT on behalf of Shane Enterprise, seeking approval to operate as a VDOT snow removal contractor during the 2014-2015 snow season.  For each application, he was required to answer "yes" or "no" to the question: "Has your company ever been terminated for default?"  *See* Exhibit 2 (September 8, 2014 VDOT rejection letter to Sariri).  Although the answer to that question was unequivocally "yes," Sariri simply left the answer blank on his applications, hoping that VDOT would somehow overlook the omission.  *Id.*  But VDOT recognized the company's prior termination for default and accordingly rejected all of Sariri's proposed snow removal agreements on behalf of Shane Enterprise for the 2014-2015 snow season.  *Id.*

After being debarred by VDOT, however, Sariri nonetheless continued to earn significant income as a VDOT snow removal contractor by simply shifting to using two nominee-owned companies, AMSC LLC ("AMSC") and AMZ, Inc. ("AMZ").  Those companies were nominally owned by family members or close friends of the defendant: namely, S.S. and A.A., respectively. But in reality, the defendant operated both companies on a daily basis and used both of them to provide highly lucrative snow removal services on behalf of VDOT, primarily for the VDOT Burke Area Headquarters ("AHQ").  Indeed, the defendant submitted scores of invoices to VDOT over the years on which he forged the signatures of S.S. and A.A. in order to fraudulently obtain millions of dollars worth of payments from VDOT for snow removal services that, in actuality, S.S. and A.A. had little, if anything, to do with providing.  *See, e.g.*, Exhibit 3 (photograph of Sariri signing VDOT invoices on March 17, 2016, followed by signature pages showing that he forged S.S. and A.A.'s signatures on those invoices).

The defendant first began plowing snow in the Burke area through his nominee-owned company AMSC in the 2014-2015 snow season: *i.e.*, the snow season immediately following his debarment.  And during that same snow season, Sariri began conspiring with the VDOT Burke AHQ Superintendent and Supervisor, Anthony Willie and Kenneth Adams, respectively, to corrupt the process for awarding snow removal work in the Burke area through the payment of bribes. More specifically, at Willie and Adams's request, Sariri agreed to make bribe payments of at least approximately 5% and as much as approximately 10% of the total amounts billed on each fraudulent invoice that he submitted to VDOT on behalf of his nominee-owned company AMSC. In return for those bribe payments, AMSC was awarded significant snow removal business in the Burke area during the 2014-2015 snow season, earning almost $630,000 in gross receipts from VDOT during that single year.

After reaping the benefits of his participation in the honest services fraud scheme during the 2014-2015 snow season, Sariri escalated it the very next season.  Specifically, he doubled-down on his fraudulent activity by bringing his second nominee-owned company, AMZ, into the mix at the start of the 2015-2016 snow season.  He then paid bribes on behalf of both of those companies in the form of cash payments to Willie and Adams during the 2015-2016 and 2016-2017 snow seasons.  In total, Sariri paid at least approximately $140,000 in cash bribes to Willie and Adams over the relevant years.  Those bribe payments were often made during meetings at off-site locations, such as over lunch at an Outback Steakhouse in Fairfax or while sitting in Sariri's Range Rover in the parking lot of a Giant grocery store in Centreville.  *See* Exhibit 4 (photographs of meeting on February 24, 2016 at Outback); Exhibit 5 (photographs of meeting on March 25, 2016 in Giant parking lot).

4

In exchange for those significant bribe payments, Sariri's nominee-owned companies were awarded significant snow removal business in the Burke area.  During the 2014-2015 through 2016-2017 snow seasons, the two companies collectively earned a grand total of almost $2.8 million in gross receipts from VDOT.  After paying necessary expenses, the net profits on those VDOT payments were approximately 25% of the gross receipts, or $699,630.50.  And of course, in exchange for the bribes, Willie and Adams also signed off on Sariri's fraudulent invoices and simply looked the other way when he repeatedly forged the signatures of S.S. and A.A. on those invoices before submitting them to VDOT.

Like the other contractor defendants in this case, Sariri did not devise this bribery scheme on his own.  Rather, it appears that he was corrupted by Willie and Adams into paying bribes as part of what other defendants have described as a well-established "culture of corruption" at the VDOT Burke AHQ.  That said, the evidence collected in this case establishes that Sariri was a much more willing, active, and enthusiastic participant in the bribery arrangement than the other contractors, and he was also far more sophisticated at laundering and concealing his fraud proceeds.

More specifically, Sariri was captured on numerous consensual recordings and intercepted telephone calls during the course of the investigation in which he discussed the bribery conspiracy with Willie and Adams.  He never displayed any hint of reluctance to pay the bribes as agreed, instead proactively suggesting meeting Willie and Adams on one occasion to make a bribe payment because, in his own words:  "There's gonna be a little somthin' somethin' coming my way so I just want to give [it to] you."  Exhibit 6 (excerpt of draft transcript of recorded meeting on March 17, 2016 at VDOT Burke AHQ).  During other recorded conversations, Sariri told Willie and Adams that he "know[s] all about capitalism" and that he always planned to "stick by" the

bribery agreement but simply wanted "to steer away from leaving any sort of like paper trail," especially in light of his concerns that someone might "snitch" to law enforcement. Exhibit 7 (excerpt of draft transcript of recorded meeting on November 24, 2015); Exhibit 8 (excerpt of draft transcript of recorded meeting at Outback on February 24, 2016).[1]

Sariri also displayed his extensive knowledge of banking regulations by describing for Willie and Adams the "difficulty" he had in "pulling [the cash bribes] out" of his bank accounts "little by little by little by little," all in an effort to avoid (in his own words) any "flagging and s***" of his money laundering or structuring transactions. Exhibit 8; *see also* Exhibit 9 (excerpt of draft transcript of recorded meeting on March 25, 2016 in Giant parking lot). Sariri also bragged to Willie and Adams about how "smart" he was to "pull[] [the money] out of two different places" (*i.e.*, two different bank accounts) to help avoid such unwanted scrutiny. Exhibit 9. And bank records bear out the fact that Sariri routinely structured his cash withdrawals from his various nominee-owned bank accounts to be in increments of $10,000 or less, and also frequently withdrew cash from multiple different bank accounts on or about the same dates.

The defendant further demonstrated his sophistication and criminal mindset by suggesting to Willie and Adams various ways that they could circumvent detection by law enforcement. His suggestions included the use of nominee-owned companies and nominee-owned bank accounts that they could use to explain away large checks by fraudulently claiming that Willie and Adams's companies had provided bogus services (*e.g.*, fence and deck repairs or catering services) to

---

[1] Pursuant to this Court's February 28, 2016 Order, *see* Dkt. No. 156, the United States is submitting as Exhibit 12 to this sentencing position a disc containing three key audio clips from these and other recorded conversations involving the defendant and his co-conspirators. The clips include an excerpt from the November 24, 2015 recorded phone conversation (which is transcribed in Exhibit 7), an excerpt from the February 24, 2016 recorded meeting at Outback (which is transcribed in Exhibit 8), and an excerpt from the March 25, 2016 recorded meeting in Sariri's Range Rover in the parking lot of the Giant in Centreville (which is transcribed in Exhibit 9).

Sariri's companies.  For example, during the meeting in his Range Rover in the Giant parking lot in March 2016, Sariri told Willie:

> Sariri:  You got your, you got your company, right?
>
> Willie: Yeah.
>
> Sariri: Same one?
>
> Willie: Yeah, but I don't have a bank account for it.
>
> . . .
>
> Sariri: Can you open one?
>
> Willie: Well, I can get my sister to open one.
>
> Sariri: That'd be even better.
>
> . . .
>
> Sariri: Cause, what I can do then. It would be a lot easier for me. Cause right now I'm kinda at a limit, where I can get like ten a week. It will take for f----- the whole summer, obviously, you know, to do that. . . .
>
> Sariri: Whereas, if I get, I've got different projects that I work on, right? . . . I've got four, three or four different properties, as you all know, that I've already kinda done stuff with.
>
> Willie: Right, right.
>
> Sariri: So what I can do, umm, you've done my fence, you've done my deck, you've done a bunch of s--- for me. And each property is a separate account as far as my company's concerned.
>
> Willie: Um hu.
>
> Sariri: And I gotta pay the man that does the work, so it makes life a lot easier. Not just now, moving forward, you know.

Exhibit 9.

Moreover, Sariri's criminal conduct did not end even when his nominee-owned companies, AMSC and AMZ, received the substantial checks from VDOT for snow removal work performed

in the Burke area.  On the contrary, Sariri then laundered those fraudulently-obtained proceeds through multiple different bank accounts, transferring the funds to Shane Enterprise or to other companies that he owned or controlled in whole or in part, and then distributing the proceeds among himself and his family members and close friends.  Sariri also involved several of his close nuclear family members in that money laundering conduct, thereby exposing them to potential criminal liability, as well.

In addition, unlike every other contractor defendant in this case, Sariri had several prime opportunities to report Willie and Adams's misconduct to law enforcement and extricate himself from an unwanted situation if he ever felt that he was being coerced into making payments against his will.  Sariri even voluntarily contacted both VDOT and local law enforcement to allege wrongdoing by another VDOT contractor, a potential competitor of his businesses with whom he also has a fraught personal relationship.  And in response to those complaints, the defendant was in fact interviewed in person by agents of the Federal Bureau of Investigation ("FBI") and officers of the Fairfax County Police Department on several occasions.  But despite being questioned during one of those interviews in December 2015 about whether he had ever been asked to pay bribes in the form of any financial or other incentive or whether he himself felt beholden in any way to any VDOT officials, the defendant falsely answered in the negative.

The defendant then falsely claimed that he would report such illegal activity if he ever encountered it.  In reality, however, Sariri had already been making bribe payments to Willie and Adams for well over a year at that point, he continued to pay bribes to them for another year-and-a-half after that interview, and he also continued pocketing substantial checks from VDOT in return for those bribes. He did all of this without ever reporting anything to law enforcement, even though the FBI agents who had interviewed him gave him their business cards, meaning that —

unlike every other contactor in this case — Sariri literally had a direct line to law enforcement to report complaints of illegal activity if he so chose. He chose not to. And notably, instead of reporting his crimes to law enforcement, Sariri actually tipped off his co-conspirators off to the ongoing investigation, telling Willie and Adams during a meeting in February 2016 that "[t]he police called me." Exhibit 8. Sariri even went to so far to warn Willie and Adams that the Fairfax County Police Department had created a "VDOT liaison position," and that there was a possible "snitch" who was providing information to law enforcement. *Id.*

Sariri was finally arrested for his involvement in the bribery scheme on August 31, 2017. The defendant was the only one of the six charged defendants in this case not to confess to law enforcement and immediately accept responsibility for his conduct upon arrest. Moreover, on the same day as his arrest, law enforcement officers searched Sariri's residence and found evidence of other criminal conduct. That evidence included multiple glass jars of marijuana with labels containing handwritten descriptions inside them, as well as several digital scales, metal grinders, and other drug paraphernalia consistent with both consumption and distribution of marijuana. It also included an AR-15 assault rifle, a 9 mm handgun, and hundreds of rounds of ammunition. *See* Exhibit 10 (photographs from search of Sariri's residence).

Sariri entered his guilty plea to Count Ten of the indictment, charging him with conspiracy to commit honest services mail fraud, on December 19, 2017. He pleaded guilty a little over one month before his trial was scheduled to begin, after filing a suppression motion to which the government was required to respond. He was also the last of the six indicted defendants to plead guilty, and he indicated his intent to plead guilty only *after* Willie and Adams had already entered their guilty pleas — notwithstanding that the government had approached him with a plea offer before either Willie or Adams. Indeed, because the defendant spurned the government's initial

plea offer and waited until after Willie and Adams had entered their pleas to plead guilty himself, he lost the opportunity to receive any credit pursuant to U.S.S.G. § 5K1.1. Sariri is accordingly the only contractor defendant who has *not* received the benefit of a government motion for a reduction in sentence based on substantial assistance. He is also the only contractor defendant who has not consented to the government's proposed order of forfeiture in this case, despite signing a plea agreement that contains a forfeiture provision.

## II.   Guidelines Calculations

As the Court is well aware, although the Guidelines are advisory, sentencing courts "must consult those Guidelines and take them into account when sentencing." *United States v. Booker*, 543 U.S. 220, 261 (2005). Thus, at sentencing a court "must first calculate the Guidelines range." *Nelson v. United States*, 555 U.S. 350, 351 (2009). Here, the United States asks the Court to adopt the PSR's findings and overrule the defendant's objections. The PSR correctly calculated the applicable offense level for this defendant as follows:

| | |
|---|---|
| Base Offense Level (§§ 2X1.1 and 2C1.1(a)(2)): | 12 |
| Enhancements: | |
| Losses between $550,000 and $1.5 million (§§ 2C1.1(b)(2) and 2B1.1(b)(1)(H)) | +14 |
| Offense involved more than one bribe (§ 2C1.1(b)(1)) | +2 |
| Acceptance of Responsibility (§ 3E1.1(a)) | -2 |
| Acceptance of Responsibility (§ 3E1.1(b))[2] | -1 |
| **Total Offense Level** | **25** |

---

[2] The United States agrees with the PSR that the defendant qualifies, pursuant to U.S.S.G. § 3E1.1(a), for a two-level reduction in his offense level. In addition, the defendant timely notified the United States of his intention to plead guilty, thus permitting the United States to avoid preparing for trial and to allocate its resources more efficiently. Accordingly, the United States hereby moves, pursuant to § 3E1.1(b), to decrease the defendant's offense level by one additional level.

Because Sariri is in Criminal History Category I, the resulting advisory Guidelines range is 57 to 71 months of incarceration.

Sariri objects to the application of a 14-level enhancement under U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1)(H) for losses greater than $550,000 but less than $1.5 million. That calculation is correct, however, because in a bribery or honest services fraud case like this one, the measure of loss is the *greater* of the bribes paid, the loss to the government, *or* the benefit received in return for the bribes. Here, the defendant admits that in exchange for the bribes he paid to Willie and Adams, he received snow removal work steered to his nominee-owned companies that resulted in $699,630.50 in net profits for those companies. Accordingly, the value of the benefit received in return for the bribes was $699,630.50, which falls squarely within the $550,000 to $1.5 million range. *See* § 2C1.1, application note 3 ("The value of 'the benefit received or to be received' means the net value of such benefit.").

In his letter to the U.S. Probation Officer concerning the draft PSR, Sariri did not explain the basis for his objection to the PSR's calculation of losses, instead simply reserving his right to object at the sentencing hearing. The United States assumes, however, that he intends to present a species of the same argument that another contractor defendant, John Williamson, unsuccessfully advanced in connection with his sentencing: *i.e.*, that he might hypothetically have been awarded much of the same snow removal work in the Burke area even if he had not paid bribes to Willie and Adams. But as this Court already recognized when overruling Williamson's objections to his PSR, that argument is unavailing. Under black-letter law, the payment of bribes in exchange for an official public action taints that entire action. It is thus simply not a defense to claim that a public official might have lawfully taken the same action anyway, regardless of the bribes paid. *See, e.g.*, *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 378 (1991); *United*

11

*States v. Quinn*, 359 F.3d 666, 675 (4th Cir. 2004); *United States v. Jannotti*, 673 F.2d 578, 601 (3d Cir. 1982).

Moreover, as noted in the addendum to the final PSR, the loss calculation outlined above does not change simply because the defendant involved other individuals in his offenses and/or dissipated some of the proceeds of his crimes by transferring funds to those other individuals or to other bank accounts. The government agrees with the Probation Officer that "[t]he fact is, the defendant's actions tainted any legitimate business AMSC or AMZ would have received from VDOT; therefore, [the companies'] total gains should be used to calculate the guidelines." PSR at 25 (Addendum). Moreover, the defendant also admitted in his Statement of Facts that he controlled the proceeds of this honest services fraud scheme. Specifically, he admitted that after VDOT checks were deposited into the bank accounts for AMSC and AMZ, he then "transferred the majority of those funds to other bank accounts in his own name or in the names of other companies that he owned or operated and managed, and then used the funds for his own benefit and for the benefit of AMSC, AMZ, and those other companies." Dkt. No. 96 (Statement of Facts) ¶ 16.

The defendant asserts (without corroborating documentation) that his ultimate "portion" of the fraud proceeds was only approximately one-third of the net profits earned by AMSC and AMZ, relying on the fact that he himself ultimately decided to disburse the remainder of the funds to the nominal owners of AMSC and AMZ, as well as to other close family members who he claims were "investors" in his companies. But a criminal defendant's decision to give fraud proceeds away to other third parties does not insulate those funds from being counted as part of the losses that must be calculated at sentencing. And here, the defendant simply cannot escape the basic facts that AMSC and AMZ collectively reaped $699,630.50 in net profits from VDOT during the

relevant years, that each and every penny of those profits was tainted by the cash bribe payments that Sariri himself made, and that Sariri himself operated and controlled both companies on a day-to-day basis, including dictating how their profits would be transferred and spent.  Under these circumstances, the full $699,630.50 in losses should be assessed to the defendant.[3]

## III.    Section 3553(a) Factors

As the Court is also well aware, after calculating the applicable Guidelines, a sentencing court must then consider that Guidelines range, as well as the sentencing factors set forth in § 3553(a), and determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).  With respect to § 3553(a)'s enumerated factors, of particular relevance here are the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, the history and characteristics of the defendant, the need to avoid unwarranted sentencing disparities, and the need to promote respect for the law and afford adequate general deterrence to similar criminal conduct.  *See* § 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(7).  As explained below, based on those factors, a sentence of 18 months (*i.e.*, approximately one-third of the low end of the applicable Guidelines range) is warranted, appropriate, and reasonable in this case.

> A.    *A sentence of 18 months of incarceration is necessary based on the nature, circumstances, and seriousness of the defendant's offense.*

The defendant's crime was unquestionably serious; indeed, it is a serious offense anytime a private contractor pays bribes to public officials in exchange for those officials taking official acts on his behalf.  The defendant's crime was even more serious, however, because it was not a

---

[3] The United States will also file a separate motion for a preliminary order of forfeiture, further explaining why the defendant should also be required to forfeit $699,630.50 in a money judgment as part of his sentence in this case.

one-time lapse in judgment.  To the contrary, the defendant made numerous conscious criminal decisions over a period of several years, choosing to pay cash bribes to Willie and Adams during at least three separate snow seasons.

Moreover, he did so in secret, without making anyone else at VDOT or in law enforcement aware of the corrupt arrangement.  That is all the more galling because defendant Sariri is the only one of the charged contractor defendants in this case to have successfully utilized VDOT's anonymous complaint mechanism, as well as to have been interviewed by law enforcement — including the FBI agents investigating this very case — on several occasions before his indictment. The defendant thus had every opportunity to come clean and to request law enforcement's help in extricating him from the situation in which he had found himself, if that situation was truly unwanted.  Yet in his complaints to VDOT and his interviews with law enforcement, the defendant never disclosed his own misconduct.  Instead, he pointed the finger at another VDOT contractor, a potential competitor with whom he also has a highly contentious personal relationship.  But when questioned about his own behavior and asked whether he had given any things of value or otherwise felt beholden to any VDOT official, the defendant lied and said "no."  He then falsely promised to report such wrongdoing to authorities if he encountered it, pocketed the business cards that the FBI agents had given him, and thereafter continued to make cash bribe payments and to collect the accompanying VDOT checks for another year-and-a-half.

The defendant now admits that he knew what he was doing was wrong all along, but he never stopped.  Instead, through repeated secret bribe payments, the defendant continued to participate in a process designed to corrupt one of the most important aspects of VDOT's operations during winter months: namely, the awarding of snow removal work to clear the Commonwealth's highways and roads after snowstorms.  And although the defendant's criminal

conduct enabled him to enrich himself to the tune of almost $700,000 in net profits, it simultaneously undermined the public's trust in a critical public service.  Moreover, particularly based on his conduct during the pre-indictment interviews, it is abundantly clear that if he had not finally been arrested by law enforcement, the defendant would have continued paying bribes to Willie and Adams for the foreseeable future.

Defendant Sariri's criminal conduct is also significantly more troubling than that of any other contractor defendant in this case because it was exacerbated by a pattern of false and fraudulent certifications to the government.  The defendant committed his crimes under the guise of two nominee-owned shell companies, which he used to continue performing snow removal work in Virginia even after VDOT had debarred him from such work in light of his company's safety violations (*e.g.*, employing a driver who did not have a valid commercial driver's license). The defendant attempted to win four VDOT snow removal contracts for the 2014-2015 snow season under the auspices of his own company, Shane Enterprise, even after that debarment.  He also deliberately refused on four separate applications to answer the simple question:  "Has your company ever been terminated for default?"  (True answer: "Yes."  Sariri's answer: " . . .").  And when VDOT predictably rejected his proposed snow removal agreements, the defendant simply shifted to using the nominee-owned companies AMSC and AMZ instead.  In reality, however, those companies were simply "Shane Enterprise" by another name.  The defendant admits that he himself operated them on a day-to-day basis and signed off on the invoices submitted to VDOT. Sariri even went so far as to forge the signatures of the nominal owners on such invoices.  *See, e.g.*, Ex. 3 (defendant forging signatures of S.S. and A.A.).  The end result is that for a period of three snow seasons, the defendant submitted dozens of fraudulent certifications to the Commonwealth in the form of false signatures on official VDOT documents.

The defendant's criminal conduct also did not begin or end with the honest services fraud itself. Rather, unlike any of the other contractor defendants in this case, the defendant also engaged in sophisticated attempts at structuring and laundering of his dirty proceeds. He deliberately made cash withdrawals in increments of $10,000 or less and withdrew funds used for bribe payments from several different bank accounts at the same time, all in an effort to avoid what he called "flagging and s***" by the banks. Exhibit 9; *see also* Exhibit 8. He bragged to his co-conspirators about how "smart" he was to cover his tracks in this way, and he displayed his own greater sophistication by educating Willie and Adams about the difficulties with flagging of monetary transactions. Exhibit 9. On one noteworthy occasion, Sariri even took the lead on instructing Willie and Adams to try to open their own nominee bank accounts in order to facilitate his future bribe payments and help him "avoid some time and headache." *Id*.

In addition, after receiving the VDOT check payments made out to AMSC and AMZ, the defendant then engaged in dizzying array of financial transactions to launder and dispose of the proceeds. Almost as soon as a check was deposited into an AMSC or AMZ bank account, the defendant then transferred the vast majority of those fraud proceeds into other bank accounts, including bank accounts in his own name, the name of Shane Enterprise, or the names of multiple other companies that he owned or controlled in whole or in part. He also involved S.S., A.A., and other close family members in this money laundering activity, thereby exposing those individuals to potential criminal liability, as well. And he is exceedingly fortunate that this case did not lead to those individuals also becoming convicted felons.

Accordingly, given the length, scope, and seriousness of the defendant's criminal conduct, the United States asks this Court to sentence him to a meaningful term of imprisonment of 18 months.

B.     *A sentence of 18 months is necessary in light of the defendant's personal history and characteristics.*

A sentence of 18 months is also necessary in light of the defendant's personal history and characteristics.  As an initial matter, the government recognizes the defendant's relative youth when compared to the other contractor defendants in this case.  However, it is noteworthy that the defendant was the only one of the contractors to have graduated from college, and the lack of any formal higher education was a factor cited by those other contractors in support of their requests for lesser sentences.  Defendant Sariri is also the only defendant to have compounded his honest services fraud with other repeated false and fraudulent certifications to the government.  And the elaborate money laundering activity described above demonstrates that he was perhaps the most sophisticated and criminally-minded of all of the contractors, notwithstanding his age.  In any event, the defendant committed his crimes as an adult who had already built up several successful businesses.  He clearly had the maturity and life experience to make lawful choices.  He simply chose not to.

Moreover, although the government certainly appreciates the difficulty of the situation in which the VDOT Burke AHQ contractors generally found themselves, the law expects individuals in that position to be able to exercise their independent judgment and refuse to go along with corrupt bribery schemes, even when those schemes present significant temptations of personal financial gain.  And at any rate, the "extortion" or coercion argument holds little to no weight for this particular defendant.  Sariri literally sat face-to-face with agents of the FBI in December 2015 and was given a golden opportunity to invoke their assistance if he wanted.  But instead he chose to lie to them and then blithely continued to make bribe payments to Willie and Adams right up until his arrest in August 2017.  Notwithstanding his current claims that he now appreciates the gravity of the situation, the defendant at the time made a clear and conscious decision not to cease

17

his criminal acts. Instead, he kept going, using mechanisms explicitly designed to conceal his corrupt conduct. And he apparently thought nothing of hiding behind the names of his family members and close friends to do so.

As the search of his residence in August 2017 demonstrated, the defendant's lack of any criminal record is also largely the product of luck, rather than a law-abiding lifestyle. When his home was searched on the date of his arrest, law enforcement officers found controlled substances and paraphernalia consistent with both consumption and possible distribution of marijuana, along with several firearms and hundreds of rounds of ammunition. *See* Exhibit 10. One of those firearms was an AR-15 assault rifle. *Id.* And although the defendant's plea agreement in this case insulates him from further charges relating to the controlled substances or possession of a firearm by a prohibited person (*e.g.*, a habitual user of controlled substances), the government submits that such conduct can and should be considered by this Court as part of its assessment of the defendant's history and characteristics.

C.    *A sentence of 18 months (approximately one-third of the low end of the adjusted Guidelines range) is necessary to avoid unwarranted disparities in sentences.*

A meaningful period of incarceration of 18 months is also necessary for defendant Sariri to avoid unwarranted disparities in sentences. The United States is mindful of the fact that other contractor defendants in this case have already been sentenced by the Court and received effectively 12-month and 9-month sentences, with a period of 6 months of incarceration and 6 months of home confinement for defendants Elmer Mejia and Rolando Pineda Moran, and a period of 3 months of incarceration and 6 months of home confinement for defendant John Williamson. But in addition to the many other distinguishing factors for this defendant that are described above (*e.g.*, the forged invoices, the money laundering and structuring activity, the controlled substances and firearms possession, the involvement of his family members and close friends in his crimes,

etc.), there is a significant gulf between Sariri and the other contractor defendants in terms of their acceptance of responsibility.  A disparity in their sentences is therefore reasonable and warranted.

Every other contractor defendant in this case confessed immediately and readily to law enforcement officers upon arrest.  Thereafter, the government approached all of the contractor defendants with plea offers.  All of the other contractors, with the exception of defendant Sariri, quickly accepted those offers and then offered substantial assistance to the government in negotiating and securing the guilty pleas of Willie and Adams.  Thus, those defendants received the benefit of motions by the government to reduce their sentences pursuant to § 5K1.1.  The other contractor defendants also all agreed to consent orders of forfeiture, and several of them have undertaken good-faith efforts to begin making payments to satisfy those obligations already.  By contrast, the defendant rebuffed the government's initial plea offer and ultimately did not plead guilty until *after* Willie and Adams had already done so.  He therefore lost out on the opportunity to receive credit under § 5K1.1 for helping to induce their guilty pleas.[4]  Sariri has also thus far not consented to an order of forfeiture.

In short, the United States submits that the relatively low sentences imposed on the other contractor defendants can only be understood in the context of their immediate and complete acceptance of responsibility.  Given the differences between them and defendant Sariri, the sentence imposed on this defendant should be higher than that imposed on the other contractor defendants.  On the other hand, the United States has recommended a significant downward

---

[4] The defendant has debriefed with the government and provided information about other individuals and other alleged criminal conduct.  The defendant thus may (or may not) receive the benefit of a substantial assistance motion under Fed. R. Crim. P. 35(b) at a later date.  The United States is currently evaluating the information provided by the defendant, but at this point that information has not resulted in the prosecutions or convictions of any other individuals, and it is presently unclear whether it will ever do so.

variance from the applicable Guidelines range for defendant Sariri. And the government's sentencing recommendation is also roughly in line with the sentences that this Court imposed on defendants Mejia and Pineda in terms of relation to the relevant Guidelines range. Their 6-month sentences represented approximately 29% of the low end of the adjusted Guidelines range for defendant Pineda, and approximately 19% of the low end of the adjusted Guidelines range for defendant Mejia. A sentence of 18 months, which represents approximately 32% of the low end of the applicable Guidelines range for defendant Sariri, would thus avoid unwarranted disparities in sentences.[5]

> D. *A sentence of 18 months is necessary to promote respect for the law and afford adequate general deterrence of other similar public corruption schemes.*

The need for general deterrence also warrants a sentence of 18 months. Indeed, general deterrence is perhaps the most important consideration in an extensive public corruption case like this one. Crimes like this one are unfortunately highly appealing, as they can yield significant benefits for their perpetrators. They are also often quite difficult to detect due to the participation of public officials who wield broad, largely unmonitored discretion, as well as the use of secretive mechanisms like cash payments handed off under the table or bank accounts opened in the names of nominee owners. The very factors that enable the criminal conduct to occur thus also frequently aid in its concealment. And courts have recognized that "[a]s a practical matter," such "efforts to conceal demand greater punishment, because they make it less likely that authorities will detect the scheme." *United States v. Shortt*, 485 F.3d 243, 251-251 (4th Cir. 2007).

---

[5] Defendant Williamson's sentence of 90 days (roughly 3 months) of incarceration represented approximately 6% of the low end of his adjusted Guidelines range. That sentence is obviously not anywhere close to what the government recommended for him, but in retrospect it may be explained by his unique personal circumstances, his complete lack of any other criminal conduct, and his extraordinary acceptance of responsibility, including payment of a substantial portion of his forfeiture obligation on the date of sentencing.

Moreover, as noted above, crimes like this one require conscious, repeated decision-making, and defendants like this one make conscious, repeated decisions to act illegally because, simply put, they believe the personal financial benefit to them outweighs the likelihood of getting caught and the duration of any potential imprisonment. A significant term of incarceration is thus necessary to serve as a counter-weight to that calculus, thereby ensuring that others who contemplate falling prey to similar temptations will think twice before doing so. *See, e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted). And the United States submits that a sentence of merely a few months of incarceration — effectively a slap on the wrist — would not send that necessary message. Instead, the only message such a sentence would send is that public corruption is worth it: that someone can bribe a public official over a period of multiple years, reap significant benefits and pocket hundreds of thousands of dollars in net profits by doing so, and then escape with a brief stay in a Bureau of Prisons camp.

A meaningful term of imprisonment of 18 months is necessary here to telegraph to other would-be defendants that crimes like this one will be met with real and significant punishment. Such a sentence would help to protect the integrity of the government's systems and safeguard the public's faith in its institutions by deterring future criminal conduct by similarly situated government contractors.

## IV.    Forfeiture

The United States also requests that the Court enter a preliminary order of forfeiture in the amount of $699,630.50, representing the net proceeds that the defendant (through AMSC and AMZ) unlawfully obtained from his participation in this honest services fraud scheme. The

proposed order is attached to this sentencing position paper as Exhibit 11, and the United States will also separately file a motion for entry of that order at sentencing.

**V.      Conclusion**

For the reasons stated, the United States requests that this Court impose a term of incarceration of 18 months, as well as a period of supervised release of three years.  In addition, the United States requests that this Court enter an order for a forfeiture money judgment in the amount of $699,630.50.

Respectfully submitted,

Tracy Doherty-McCormick
Acting United States Attorney

By:      _____/s/_____
Kimberly Riley Pedersen
Samantha P. Bateman
Counsel for the United States
Assistant United States Attorneys
U.S. Attorney's Office
2100 Jamieson Ave
Alexandria, VA
Phone: 703-299-3700
Fax: 703-299-3981
Email: Kimberly.Riley.Pedersen@usdoj.gov
        Samantha.Bateman@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2018, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing ("NEF") to all counsel of record.

By: _____/s/_____
Samantha P. Bateman
Counsel for the United States
Assistant United States Attorney
U.S. Attorney's Office
2100 Jamieson Ave
Alexandria, VA
Phone: 703-299-3700
Fax: 703-299-3981
Email: Samantha.Bateman@usdoj.gov